WILLIAM W. DENNIS, ASSIGNEE OF THE HOLMES LUMBER COMPANY, v. JOHN C. LEATON, ALBERT B. UPTON, ET AL.

*Contract—Failure to deliver lumber—Lien—Equity—Damages.*

This case involves the alleged failure of defendants Leaton and Upton to perform a contract for the manufacture and sale of lumber, which performance was secured by a lien upon the lumber, and the Court find such breach, and decree that said defendants shall pay to complainant the difference between the contract price of the lumber sawed and the cost of replacing it. The case is one purely of fact, and reference is had to the opinion for further amplification of the facts.

Appeal from Wayne. (Chambers, J.)   Argued June 21, 1888.   Decided November 28, 1888.

Bill to cancel certain acceptances, and to assess complainant's damages for the non-performance of a sawing contract. Complainant appeals. Decree reversed, and one entered as stated in head-note. The facts are stated in the opinion.

*H. M. Campbell,* for complainant, contended:

1. Complainant is a new party, who is himself entitled to all the relief and to the benefit of the old suit; citing Jennison, Ch. Pr. 353; 2 Dan. Ch. Pr. 1546; Milf. & Ty. Eq. Pl. 170; Story, Eq. Pl. § 353; 2 Barb. Ch. Pr. 86.

2. The lien under the contract, will be enforced by a sale of the property; citing 2 Story, Eq. Jur. §§ 1216–1220; *Glidden v. Norvell,* 44 Mich. 202.

3. The court, having cognizance of the case to cancel the acceptances, will retain the case and assess the damages; citing *Carroll v. Rice,* Walk. Ch. 373; *Brown v. Gardner,* Harr. Ch. 291; *Whipple v. Farrar,* 3 Mich. 446; *Teft v. Stewart,* 31 Id. 367; *Miller v. Stepper,* 32 Id. 194; *Folkerts v. Powers,* 42 Id. 283; *Railway Co. v. Railroad Co.,* 63 Id. 645.

4. The measure of damages is the difference between the contract price and the cost of replacing the lumber at the time the delivery should have been made; citing *Haskell v. Hunter,* 23 Mich. 305; *McKercher v. Curtis,* 35 Id. 478; *Chadwick v. Butler,* 28 Id. 349; *Bates v. Stansell,* 19 Id. 91.

*Wisner & Draper,* for complainant, filed a brief, which is confined to a discussion of the testimony.

*Dodds Brothers* (*I. A. Fancher* and *Benton Hanchett,* of counsel), for defendants Leaton and Upton, contended:

1. The representations as to the solvency of the Holmes Lumber Co., which were false, were a fraud upon defendants, which entitled them to cancel or refuse to perform the contract; citing 2 Pars. Cont. (6th ed.) 767, 770, 785, 786; *Converse v. Blumrich,* 14 Mich. 123; *Jewett v. Petit,* 4 Id. 508; *Newell v. Randall,* 50 Am. Rep. 562; and the change in the contract did not affect this right, unless it is shown that they knew of the fraud when the change was made; citing Kerr, Fraud & Mis. 299–302.

2. The defendants were justified in refusing to proceed further with the contract; citing *Hosmer v. Wilson,* 7 Mich. 304; and neither the Holmes Lumber Co. nor the complainant, who simply takes its rights, can assert any rights under it, thus claiming advantages resulting from their own fraud; citing *Barnes v. Brown,* 32 Mich. 153; 1 Story, Eq. Jur. (12th ed.) § 64 e; 2 Pars. Cont. 782.

3. The delivery up of the acceptances was not necessary in order to cancel the contract; citing *Dayton v. Monroe,* 47 Mich. 193;

*Hanold v. Bacon*, 36 Id. 1; *Frost v. Lowry*, 15 Ohio, 200; *Martin v. Roberts*, 5 Cush. 126.

4. The contract covers only the lumber from the logs specified, whether more or less than 4,000,000 feet in amount; citing *Switzer v. Mfg. Co.*, 59 Mich. 496.

5. The measure of damages is the difference between the contract price and cost of lumber of the same quality and quantity, to be determined by the price at which such lumber could be bought in the market at wholesale, or, if it could not be obtained at wholesale, then at retail; citing *Haskell v. Hunter*, 23 Mich. 309.

MORSE, J. The Holmes Lumber Company, in 1885, was a corporation organized under the laws of this State, and doing business at Detroit. January 5, 1885, said company entered into an agreement with the firm of Leaton & Upton, composed of the defendants John C. Leaton and Albert B. Upton, and located at Mt. Pleasant, in Isabella county, in this State. This agreement, as originally made, in substance provided:

1. That Leaton & Upton are to sell to the Holmes Lumber Company 4,000,000 feet of lumber, to be manufactured at their mill by July 1, 1885, out of certain logs; the lumber to be piled on their yard, and loaded on the cars as the lumber company direct.

2. The price of the lumber is fixed according to certain 11 grades into which it is to be assorted.

3. The lumber company are to buy the lumber, and direct and accept delivery on board of cars, and pay by furnishing on the 5th of each month acceptances of two-thirds of the purchase price of all lumber cut and piled the previous month, and payable in Detroit 90 days from date, and be taken up by the proceeds of the lumber when shipped. If shipments are not made fast enough to take up the paper as it falls due, they shall be renewed from time to time until the shipments will take them up. After all such paper is paid, the remaining shipments to be settled for monthly by paper at 90 days, payable at Detroit.

4. As fast as cut the lumber to be assorted and piled in grades by an assorter to be agreed upon, who was to furnish monthly statements of the amount and grades of

lumber, and the acceptances were to be given upon such statements. When loaded on the cars the lumber was to be inspected, and the lumber paid for according to that inspection.

5. In case the Holmes Lumber Company become dissatisfied with the assorter or inspector, a new one was to be chosen by arbitration.

6. As fast as the lumber was assorted and piled, it was to be marked with the lumber company's mark, and the company was to have a lien on the lumber to secure the faithful performance of the contract.

7. Leaton & Upton were to keep the lumber at all times insured, in companies to be approved by the second party, for an amount equal to the advances upon it, which shall run to the party of the second part, as its interest may appear.

8. If at any time the mill of the parties of the first part shall be destroyed by fire, or otherwise injured, so as to prevent its running, or if they shall be unable, on account of strikes of railroad employés, to ship their logs over the railroad to their mill, or strikes of mill-men, the time for sawing said lumber shall be extended for such reasonable time, not to exceed 90 days, as may be necessary to rebuild or repair said mill, or to ship said logs, or hire new men.

The parties began to operate under this contract soon after it was made. On April 8, 1885, the third clause was changed so as to make the acceptances payable at the Commercial Bank of Mt. Pleasant, and to be taken up by the proceeds of the lumber when shipped. On each car-load, when shipped, Leaton & Upton were to make a sight draft, payable to the order of the Commercial Bank, which bank was to be responsible for the application of the sight drafts upon the acceptances, and until the payment of such draft Leaton & Upton were to have a lien upon such car-load for its payment. After all acceptances advanced were paid, sight drafts were to continue to be made on the shipments, deducting 2 per cent. from the contract price of the lumber. The acceptances were to be renewed until the shipments would pay them.

The Holmes Lumber Company agreed to ship two-thirds of the lumber by January 1, 1886, and the balance by June 1, 1886.

Under the original contract, and as modified, estimates or reports of the lumber sawed and piled were made, and acceptances advanced for each month's sawing, except for the amount cut in June, 1885, for which Leaton & Upton refused to make a draft.

On July 7, 1885, Leaton & Upton wrote the lumber company as follows:

"To The Holmes Lumber Co. (Incorporated),
"Detroit, Mich.

"*Gentlemen:* You have breached the contract between us which bears date Jan'y 5, 1885. We therefore hereby advise you that we consider and shall treat the same as canceled.

"Yours truly,
"Leaton & Upton."

At this time something over $10,000 of acceptances were out. Leaton & Upton refused to deliver up or cancel these acceptances, or to deliver any lumber. The Holmes Lumber Company never received any lumber upon this contract, although it presented an order for shipment.

Leaton & Upton refused absolutely to perform the contract, and thereupon the Holmes Lumber Company filed its bill of complaint in the Wayne circuit court, in chancery, for the purpose of having surrendered up and canceled the acceptances, for which it had received nothing, to assess its damages resulting from the failure of Leaton & Upton to perform the contract, and satisfy the same by enforcing the lien upon the lumber provided by the contract. The bill averred the insolvency of Leaton & Upton, and prayed for an injunction restraining them from disposing of the lumber and acceptances. Upon the filing of the bill a preliminary injunction as prayed was

granted. Afterwards the defendants surrendred the accept-
ances, and, upon their filing a bond in the sum of $5,000
to pay any decree which might be rendered against them,
by stipulation of counsel, the injunction was dissolved.

After the cause was at issue the Holmes Lumber Com-
pany made a general assignment for the benefit of its
creditors. William W. Dennis, the assignee, filed the
present bill in the nature of a bill of revivor and supple-
ment, upon which the proofs were taken and hearing
had. Hon. F. H. Chambers, who heard the case, entered
a decree dismissing the bill of complaint, from which the
complainant appeals to this Court.

The Commercial Bank of Mt. Pleasant was made a
defendant because, before the commencement of the suit,
Leaton & Upton had assigned their interest in the con-
tract to said bank, and also in April, 1885, it had taken
an assignment of the interest of said Leaton & Upton in
the lumber and logs cut and to be cut under the con-
tract. By the release, however, of the lumber, and the
execution of the $5,000 bond, as the case now stands,
the bank has no particular interest in this litigation.

We have carefully examined the proofs in the case, and
are satisfied that the decree of the court below must
be reversed. The evidence shows that Leaton & Upton,
as we think, without cause, deliberately refused to per-
form their contract. Therefore the complainant is
entitled to a decree for damages for the non-performance
of the contract.

The defendants seek to avoid their liability upon three
grounds.

*First,* they claim that the contract was procured by
fraud, through the representations of Hugh A. Holmes,
president of the corporation, that the Holmes Lumber
Company was worth from $80,000 to $100,000, over and
above their liabilities, and that their paper was first-class,

and was readily current in Detroit at 7 per cent. discount at the banks; that said lumber company was mixed up in none other than the lumber business; that Leaton & Upton relied. on these statements, and the credit of said company as so represented, and were thereby induced to make the contract; that these representations proved to be false; that, in fact, the Holmes Lumber Company was not responsible, and its paper could not be discounted on their credit, in Detroit or elsewhere.

That in March, 1885, Morris Holmes, vice-president of the company, stated that the company, three years before, was dealing in options, and failed, and was running on a very small capital. On learning of this statement of said Morris Holmes, they inquired of its truth of Hugh A. Holmes, who denied it. They claim that it was necessary that they should be enabled to float these acceptances in order to obtain money to get out the logs, and this was known to Hugh A. Holmes, who negotiated the contract on behalf of the company.

We are not satisfied from the testimony that Hugh A. Holmes ever made any representation that the company was worth $80,000 to $100,000, and we are convinced that the company was in good financial standing all the time from the making of the contract. to the date of the refusal of the defendants to perform it; and that their paper could have been readily discounted during that time in Detroit at 7 per cent. Four leading bankers of Detroit, among them David Preston and Mr. Wendell, testify that the standing of the company was good, that they met their paper promptly, and large discounts were made on the strength of the financial reputation of the company. There is no evidence that previous to their assignment the paper of this company was ever protested, or failed to be promptly taken care of and met when due. Leaton and Upton both admitted that they knew of no

instance of the failure of the company to promptly meet its obligations. And while this contract was in existence, and when they knew of some of the facts upon which they now base a claim of fraud, they sold this company, outside of the contract, some $3,000 worth of lumber on credit, upon 90-day acceptances, which acceptances were promptly paid as they fell due. Upton also admits that at the time negotiations were going on as to the contract he was referred by Hugh A. Holmes to the commercial agencies, and that he went to Dun's agency, in Detroit, in April, 1885, and was there informed that their financial reputation was good, and that they met their paper promptly.

It is urged that the fact of their assignment is sufficient proof of the irresponsibility of the company, and of the fraud charged. We do not think so. The assignment was not made until December 22, 1885, and was caused by the failure of the firm of M. Hyatt & Co. The Holmes Lumber Company was indorser upon about $30,000 of their paper, received by the company in payment of lumber sold to Hyatt & Co., and which had been discounted. The assignment was made to protect the other creditors of the company. There is no reason to believe that Leaton & Upton would have lost anything by non-payment if they had performed their contract. They would probably have received their pay in full for all the lumber shipped.

The fact that they subsequently sold this lumber to Crosby & Collins for about five dollars per thousand above the contract price, and that lumber that season was being sold on a rising market, seems to furnish the best reason why the defendants refused to fulfill their agreement.

There is another significant fact to be considered.

72 MICH.—38.

After Leaton & Upton, as they claim, discovered this fraud upon them, instead of canceling the agreement then and there, they modified it. After they learned what Morris Holmes had stated about the Holmes Lumber Company dealing in options, one or both of the defendants went down to Detroit. Mr. Upton also testifies that he undertook to negotiate some of the paper, inquired at the Detroit National Bank if he could place the paper there, and the cashier told him, "No." He also inquired of some parties as to the responsibility of the lumber company, and was informed that its standing was not good.

W. N. Brown, vice-president of the Commercial Bank of Mt. Pleasant, also testifies that he tried to discount one of the company's acceptances at several banks in Detroit, and could not do so; and that he learned from several parties, although he did not inquire at the commercial agencies, that the company had no financial standing in Detroit. One McCabe also testifies to the same effect. The result of these endeavors and inquiries were known to both Leaton & Upton before the change in the contract of April 8. It would seem that the proper time to have refused performance of the contract would have been at once, upon the heels of these inquiries; but, instead of doing so, the contract is recognized and renewed by the change in the third clause heretofore noted.

The defendants claim in explanation of this action that they then informed Mr. Hugh A. Holmes of what Morris Holmes had stated as to the dealing of the company in options, and told him that if they learned that the representations as to the financial standing and worth of the company were untrue, they should cancel the contract. Hugh A. Holmes admits that they told him what they

had learned Morris had stated, but says that he stated to them that it was false. He denies that either one of the defendants, at or before the amendment to the contract, said that, if they ascertained that the statement of Morris as to their dealing in options was true, or if the company proved to be not worth $80,000, they would cancel the contract. No statement that they would cancel the contract, and no threat that they would cancel it, on the happening of any event, was ever made by either of the defendants.

He further testifies that after the 8th of April no complaint was ever made by the defendants of any difficulty in discounting the paper of the company, nor any hint given that the contract was not being fully performed on the part of the complainant corporation, and it does not appear in the evidence that either of the defendants ever made complaint during the existence of the contract, either to Mr. Hugh A. Holmes, or any other member of the company, that they could not float the paper of the company in Detroit.

There is also reason to believe from the testimony that the change made in the third clause was desired by the defendants, in order that they might discount the paper at Mt. Pleasant, and help them in their dealings with the Commercial Bank there. It will also be noticed that in the letter of July 7 no fraud is claimed in the inception of the agreement, but simply a claim that the company has "breached" it. The claim of fraud cannot successfully be maintained, either in this respect or in the employment of Sherman to grade the lumber, which is made the defendants' *second* ground of defense.

Sherman was recommended by the company, and accepted by defendants, to grade the lumber as it came from the mill, in the beginning of the sawing under the contract. The defendants contended in the court below, and gave

evidence tending to show, that Sherman was entirely unknown to them; that Hugh A. Holmes procured their assent to Sherman's employment by stating that he was a stranger to him, but was well recommended; that in fact Sherman had worked for the lumber company before, and in his work, when defendants were not by, fraudulently assorted the lumber in favor of the company.

This charge of fraud on the part of Sherman is not sustained, in our opinion, by the evidence. No complaint was ever made to the company that Sherman was doing his work unfairly; and when the defendants sold lumber outside of this agreement, to the Holmes Lumber Company, they agreed upon Sherman as the inspector, and, according to Upton's testimony, he was kept assorting the lumber a long time after they knew he was grading it unfairly, and six weeks working with another man, whom the defendants now claim was selected to take his place, because they were dissatisfied with Sherman.

The *third* defense is that the lumber company violated the contract because, in its letter of July 2, submitting the statement of the inspector for the month of June, showing the *whole* amount of the lumber sawed and piled to be $22,637.69, the company, in asking the defendants to make their draft for its acceptance for $4,932.50, the balance of two-thirds of that amount, over and above the acceptances before made, also required that such draft should be accompanied by insurance running to the company for the amount of $15,091.79. The defendants claim that they had made a verbal agreement with one Bennett, an agent of the company at Mt. Pleasant, and who was looking after the company's interest at the mill, that the insurance obtained upon the lumber should be in favor of the Commercial Bank, which discounted the acceptances. Bennett denies that he ever made any arrangement with the defendants that the insurance might

run to the bank, and not to the company. The only thing he consented to was that it might run in favor of both of them, as their interest might appear. It is also shown that he had no authority to make the agreement in relation to insurance, as claimed by the defendants. Also that H. M. Campbell, the attorney of the Holmes Lumber Company, of date June 16, 1885, wrote both to the defendants Leaton & Upton and to the Commercial Bank, insisting that insurance be effected on the full amount of the lumber sawed, in favor of the company, according to the terms of the written agreement. These letters were not answered or returned.

The company was not notified that Bennett had made any different arrangement. And in the letter of July 7, of defendants, no claim is made that there is anything wrong about the demand for insurance. If this claim for insurance was the breach of the contract, as is claimed in the argument in this Court, why did not the defendants tender the draft, without insurance, for the acceptance of the company, stating the agreement with Bennett? This, it seems to me, would have been the natural way of doing business. It hardly can be claimed that a contract is violated by merely claiming more performance than it requires, unless the performance required is tendered and refused. If one owes another $100, he will not be excused from the payment of it for no other reason than that the creditor demands more than $100.

Looking the evidence all over, and giving due weight to the claims of the defendants, it is clear to my mind that Leaton & Upton had no possible excuse for refusing to perform their contract. It may be that they so refused because they feared that the company was financially unsound, and might ship all the lumber, and dispose of it without paying them for it. This is one of the reasons assigned for their refusal. But they had no legal justifi-

cation of any such fear from what appears in this record.

The question of the amount of the damages is not easy to be determined from the testimony. We think, however, that the amount of lumber to which the company was entitled should be confined to the amount sawed. This seems to be all the lumber furnished by the logs mentioned in the contract, according to the testimony of the defendants, which is not disputed. The inspector's statement shows that there was sawed at the time of the cancellation of the contract 2,187,442 feet. After that defendants sawed from the logs specifically named in the contract 600,000 or 700,000 feet, according to the testimony of the defendants. Calling it 600,000, would make the total amount 2,787,442 feet. The contract price averaged $11.39 per thousand feet. As near as we can gather from the testimony, it would have cost the lumber company at least $13.50 per thousand to have replaced this lumber, obtaining it as fast as they could in the market after the breach of the contract. In December the defendants sold it for $16.50, but there is testimony that lumber had risen in price in the fall. We think the difference between $13.50 and $11.39 per thousand an equitable basis for the computation of damages. This amounts to $5,881.50.

A decree will be entered in this Court reversing the decree in the court below, and for the payment by the defendants Leaton and Upton to the complainant of the sum of $5,881.50, with interest from July 7, 1885, to the date of such decree, with costs of both courts to the complainant.

The other Justices concurred.